## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Case No. 1:18-cv-01230-DDD-SKC

ERIN MELVILLE,

    Plaintiff,

v.

THIRD WAY CENTER, INC.,
ELIZABETH MAPLE, and
RENEE JOHNSON,

    Defendant.

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff, who has a history of documented mental health conditions, worked as a therapist for Defendant, which operates residential child care facilities that provide therapy to at-risk teens. Defendant terminated Plaintiff after she experienced suicidal ideations at work, and checked herself into a hospital. Plaintiff alleges, among other harms, that Defendant interfered with her entitlement to medical leave in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, and discriminated against and failed to accommodate her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*. Defendants have moved for summary judgment on all claims, and the matter is fully briefed. (Docs. 67, 79, 84.) For the following reasons, the Court **GRANTS** the motion.

I.    **UNDISPUTED MATERIAL FACTS**[1]

Defendant Third Way Center, Inc. (Third Way) operates licensed residential child care facilities, including Bannock House. Colorado statute and regulations prohibit such facilities from hiring or continuing to employ any person whose physical or mental health or emotional or psychological makeup impairs her ability to properly protect the health and safety, or who could endanger the physical or psychological well-being, of the children in their care.[2]

Plaintiff Erin Melville has a long history of suicidal ideation and severe mental illness, including major depressive disorder recurrent episode (chronic), personality disorder, disorganized thinking, auditory hallucinations, and dissociative identity disorder, which includes the following multiple personalities: (1) Erin (herself); (2) Florence; (3) Caroline; (4) Emma; and (5) Snow. She has attempted suicide at least three times, including one gun-related attempt in February 2015.

Without disclosing any of her conditions or suicide attempts in her professional license or job applications, Ms. Melville became a provisional licensed

---

[1]    With their briefing on the Motion, the parties have supplied statements of undisputed material facts. Where no objections have been lodged to the facts contained therein, the Court reports the undisputed facts without citation.

The parties have also filed supporting documents with appropriate motions for leave to restrict. (Docs. 68, 77, 80, 85.) Because these supporting documents contain highly sensitive medical information, the Court **GRANTS** the motions.

[2]    12 Colo. Code Regs. § 2509-8:7.714.91(D).

professional counselor in Colorado,[3] and began working as a mental health counselor at Bannock House in December 2015. Third Way mental health counselors provide crisis intervention and counseling, under the supervision of therapists, to the teens in the social environment at the house. Third Way requires its mental health workers to be either licensed or working toward being licensed by the Colorado Department of Regulatory Agencies. In hiring Ms. Melville, Third Way believed her qualified to obtain licenses from the State Board of Licensed Professional Counselor Examiners (Board).

In September 2016, Ms. Melville told a supervisor, Brittany Martinez, about one of her prior suicide attempts and some details of her mental health history. At the supervisor's suggestion, she shared some of that information with other coworkers at a staff meeting a few weeks later. Defendant Elizabeth Maple, Ms. Melville's immediate supervisor, later discussed these mental health issues with her and the impact they could have on her work with clients at Third Way. Ms. Maple also discussed them with another doctor. At that time, Third Way did not take any disciplinary or other action because Ms. Melville was meeting her job requirements and it did not then have any reason to believe she would be unable to in the future. On January 30, 2017, Third Way promoted Ms. Melville to therapist.

---

[3] More specifically, "in August and December 2015, Melville failed to report a mental illness or condition that affects her ability to treat clients with reasonable skill and safety on her Licensed Professional Counselor Candidate ("LPCC") and provisional professional counselor ("LPP") applications." (Cessation of Practice Agreement, Doc. 67-1, at 1 (undisputed).)

During the summer of 2017, Ms. Melville told Ms. Maple that she was experiencing an increase in symptoms, including anxiety, and was seeking treatment. On August 23, 2017, Ms. Melville experienced suicidal ideations at work. She told her co-workers that she was feeling unsafe and had decided to end her life that night. She then she voluntarily presented at the Parker Adventist Hospital emergency department and was not released until the following morning.

Following the incident, Ms. Melville requested, and was granted, FMLA leave. On September 7, Dr. John Carlson, M.D., completed an FMLA healthcare provider certification indicating Ms. Melville's condition rendered her unable to perform essential job functions of carrying out individual, group, and family therapies and that she would be incapacitated until at least September 21. It was also "medically necessary" for "her to attend follow-up treatment appointments" for up to six hours per day. Dr. Carlson referred Ms. Melville for a two-week partial hospitalization plan and six-week intensive outpatient program.[4] She only attended these programs a handful of times and did not complete either one.

On September 8, Ms. Melville contacted Third Way seeking to immediately return to work. On September 11, she met with Ms. Maple and Defendant Renee Johnson, another of her supervisors, at a coffee shop. She told them she had ceased treatments, and that she would have to deal with periodic suicidal ideations for the

---

[4] The parties disagree over whether the treatment plan advanced by Dr. Carlson was "recommended" or "required" (*See* Doc. 79, at 4), though there is no dispute that no health professional, including Dr. Carlson, ever cleared Ms. Melville to return to work.

4

rest of her life. Ms. Melville expressed financial anxiety due to being on unpaid FMLA leave, and Ms. Johnson stated that she could find another job—such as working as a waitress—or quit and apply for unemployment benefits and Third Way would not contest her application. Ms. Maple and Ms. Johnson advised her that she wouldn't be able to come back to work until she received clearance from Dr. Carlson and her mental health providers. Despite making repeated requests for a return-to-work letter from several providers, every provider refused her request, and Ms. Melville never received clearance to return to work or otherwise showed that she was psychologically unimpaired.

Based on Ms. Johnson's suggestions concerning unemployment benefits, Ms. Melville believed she had been fired. And in fact, Third Way paperwork dated September 14 reflects "involuntary" "termination" for being "unable to effectively work with [Third Way] kids at this time." On September 15, Third Way's executive director left her a message encouraging her to finish her FMLA leave and complete treatment until Dr. Carlson was satisfied she could return to Third Way. Ms. Melville did not call back and, on September 17, she applied for unemployment benefits through the Colorado Department of Labor.

On May 31, 2018, Ms. Melville entered into an agreement with the Board, in which she agreed not to practice as a counselor during the pendency of the Board's investigations into her mental health and alleged[5] misrepresentations on her

---

[5]     Ms. Melville admits failing to report her mental illness and conditions on her licensure applications (Doc. 79, at 2) but denies, as alleged by the Board, that failing to do so violated the Mental Health Practice Act (Doc. 67-1, at 1).

applications. On April 11, 2019, the Colorado Attorney General and the Board took disciplinary action against her, charging her with failing to notify the Board of a mental illness or condition affecting her ability to treat clients with reasonable skill and safety, failing to act within limitations created by mental illness, and fraud in securing her license in violation of Colo. Rev. Stat. §§ 12-43-222. That case is set for a hearing in January 2020.

On April 13, 2018, Ms. Melville sued Defendants in the Colorado District Court for Denver County. She asserted claims under the FMLA, the ADA, and several state-law tort theories. On May 18, 2018, Defendants removed the action here, invoking the Court's original and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1367(a) and 1441(a). On May 22, 2019, Defendants filed moved for summary judgment on all claims.

## II. ANALYSIS

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving

party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145. Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by demonstrating a lack of evidence for an essential element of the non-movant's claim. *Id.* That is, if a defendant shows entitlement to summary judgment, it becomes a plaintiff's "burden as the non-movant to set forth specific facts demonstrating that there was a genuine issue for trial as to those material matters for which she carried the burden of proof." *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531 (10th Cir. 1995).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence and instead must view it and draw all reasonable inferences from it in the light most favorable to the non-moving party. *Adamson*, 514 F.3d at 1145. But neither unsupported conclusory allegations nor mere scintillas of evidence are sufficient to create a genuine dispute of material fact on summary judgment. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, a court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

### A. FMLA Interference Claim (Count I)

Ms. Melville asserts that Third Way unlawfully interfered with her right to medical leave. Under the FMLA, an eligible employee who cannot perform the essential functions of her position because of a serious medical condition is entitled to up to twelve workweeks of leave. 29 U.S.C. § 2612(a)(1)(D). It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's right to that leave. 29 U.S.C. § 2615(a)(1). To establish an interference claim, a plaintiff must show: "(1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, and the *McDonnell Douglas* burden-shifting analysis does *not* apply to interference claims." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006) (emphasis in original; citing *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 10th Cir. 2002)).

Ms. Melville undoubtedly has a serious medical condition. But Third Way argues that Ms. Melville cannot show that she was prevented from taking the full twelve weeks of leave, denied reinstatement following leave, or denied initial permission to take leave. *See Metzler*, 464 F.3d at 1180. On this point, Third Way

8

makes much of the fact that Ms. Melville's supervisors initially encouraged and supported her decision to take leave. To the extent that any party was responsible for interfering with her FMLA leave, they argue, it was Ms. Melville herself in seeking to return to work almost immediately and without the approval of her healthcare providers. Ms. Melville counters saying any discouragement of an employee inconsistent with her right to leave amounts to interference. She believes, therefore, that Third Way's suggestion that it would offer unemployment benefits or the implication that she should take another job were adverse actions. The Court is not persuaded that Third Way's offerings in this regard were adverse but rather seem to have been made to help Ms. Melville find a way to maintain income while seeking treatment. But no matter how encouraging or supportive it may have been, the company cannot avoid the fact that according to its own records it terminated her while she might have been legally permitted to be on leave. And "any reasonable employee would have found termination materially adverse." *Metzler*, 464 F.3d at 1171. Ms. Melville has supported this prong with sufficient facts.

Nevertheless, Ms. Melville has failed to establish a prima facie case of FMLA interference for want of causation. The FMLA is "not a strict liability statute." *Id.* at 1180 (citing 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.")); *see also Smith*, 298 F.3d at 960. Thus, "an employee may be dismissed, preventing her from exercising her statutory

9

right to FMLA leave if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Smith*, 298 F.3d at 961. An "indirect causal link between the employee's dismissal and FMLA leave (i.e., the fact that they independently resulted from the same cause) [is] inadequate as a basis for recovery under the FMLA." *Id.* at 961. The burden to demonstrate that "an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave" is on the defendant-employer. *Id.* at 963; *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

In *Renaud v. Wyoming Dept. of Family Services*, the plaintiff went on FMLA leave for treatment of alcoholism the day after being suspended pending an investigation of allegations that he was drunk on duty. 203 F.3d 723, 732 (10th Cir. 2000). While he was still on leave, the plaintiff was terminated for the alcohol violation that pre-dated his taking leave. *Id.* He then sued under the FMLA claiming that the defendant-employer had interfered with his FMLA rights. *Id.* In affirming a judgment on a jury verdict in the defendant's favor, the Tenth Circuit held that an employee who requests or is on FMLA leave has no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he did before submitting the request. *Id.* The Circuit has affirmed that "*Renaud* establishes that the FMLA only applies when an employee is

10

not restored for reasons related to the request for or the taking of FMLA leave."
*McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002).

Third Way argues that its adverse employment action was not caused by Ms. Melville's request for FMLA leave because both that request and its termination decision were independently caused by the increasingly serious manifestations of her mental illness. Put another way, the same circumstances that made her leave necessary also rendered it impossible for Third Way to permit her to work there. Third Way also submits that it would have been in violation of Colorado law to continue to employ Ms. Melville or permit her to return to work before she had been cleared by a healthcare provider.[6] Ms. Melville responds by arguing that, at the time of her termination, her FMLA leave had only just begun, and she should have been permitted to use the full statutory period to get better. As she also points out, her retained expert—who evaluated her in 2019—has concluded that she likely would have been able to return to work safely in the fall of 2017. Even if true, however, this does not overcome the fact that at the time of her termination, she was unable to perform her work and had given no indication that she was or could become psychologically unimpaired such that Third Way could legally continue her employment. She simply sought immediate reinstatement.

---

6  Third Way cites to 12 Colo. Code Regs. § 2509-8:7.714.91(D) and (E) (quoted *infra* at note 7). Subsection (E), which prohibits one with a *physical* condition from being returned to her position "until the condition has cleared to the satisfaction of the examining physician or nurse practitioner" does not appear directly relevant to this case. Subsection (D), however, prohibits a facility from hiring or continuing to employ someone psychologically impaired if that impairment could endanger the well-being of the children.

11

Like the plaintiff in *Renaud*, Ms. Melville was not terminated because she took leave. She was terminated because she was demonstrably a danger to herself (and possibly the young persons at Bannock House).[7] Because of the financial hardships she stated would be associated with continued unpaid leave, Ms. Melville appeared unable or unwilling to undertake the prescribed treatment, and demanded immediate reinstatement, even though neither Dr. Carlson nor any other mental health provider had cleared her to do so.[8] Since at that point she was not willing to address her psychological impairment, Third Way reasonably believed termination would provide her with more resources than unpaid leave. *See Medley v. Polk Co.*, 260 F.3d 1202, 1207–08 (10th Cir. 2001) (holding that an employer's good faith belief that an employee has abandoned her job will defeat an FMLA interference claim, even if this belief turns out to be mistaken). Rather than interfere in violation of the FMLA, her coworkers had *encouraged* her to take time she needed to get help and only mentioned unemployment benefits to her as an option after she was unwilling to undergo the treatment her doctor had prescribed. Ms. Melville has not shown that the Third Way's action was related to anything

---

[7] "A facility shall not hire or continue to employ any person whose health, educational achievement, or emotional or psychological makeup impairs his/her ability to properly protect the health and safety of the children in care, or who could endanger the physical or psychological well-being of the children." 12 Colo. Code Regs. § 2509-8:7.714.91(D) (governing residential child care facilities like Bannock House); *see also id.* at § 2509-8:7.714.91(E) ("A staff member who, upon examination or as a result of tests, shows indication of a physical condition which could be hazardous to a child, other staff, or self, or which would prevent performance of duties, shall not be assigned or returned to his/her position until the condition has cleared to the satisfaction of the examining physician or nurse practitioner.").

[8] *See* Undisputed Fact No. 19.

12

other than her severe mental illness and express refusal to resolve it. Summary judgment is granted in favor of Third Way on Count I.[9]

### B. ADA Claims (Counts II and III)

The ADA prohibits covered entities from discriminatorily discharging qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). Determining a disabled individual's qualification for ADA protection is a two-part inquiry:

> First, [a court] must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) [the court] concludes that the individual is not able to perform the essential functions of the job, [it] must determine whether any reasonable accommodation by the employer would enable [her] to perform those functions.

*Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1168 (10th Cir. 1996). On a claim alleging unlawful termination, the relevant time-period is the time of

---

[9] Third Way additionally argues that the after-acquired evidence doctrine shields it from liability because, after it terminated Ms. Melville, it discovered her failure to disclose her mental health history to the Board via subsequent disciplinary action. (Doc. 67, at 17–18.) But as Ms. Melville points out, in *McKennon v. Nashville Banner Publishing Co.*, the Supreme Court held that doctrine did not shield employers from liability under federal ADEA discrimination law (though it was relevant to damages). *See Perkins v. Silver Mountain Sports Club & Spa, LLC*, 557 F.3d 1141, 1145 (10th Cir. 2009). The Court is not impressed with Third Way's reply on this point, which cites extensively from *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638 (1995), but fails to identify that case as being from a California state court, and *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 549 (Colo. 1997), which it improperly identified as being decided by *this* Court. Neither one of these authorities permits the Court to import inapplicable Colorado law into its decision here. Summary judgment, however, is still appropriate.

13

termination. *See, e.g., Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1266 (10th Cir. 2002).

In Counts II and III, Ms. Melville alleges that she was unlawfully terminated and refused reasonable accommodation by Third Way. As with Count I, the Court treats her disabled for present purposes.[10] In her briefing, Ms. Melville indicates some level of competency pre-dating her hospitalization, but she does not offer a single argument or fact to explain her conclusion that she was "qualified . . . without reasonable accommodation" to perform the essential functions of her position at the time of her termination. Ms. Melville had been serving as a therapist at a residential care facility. As discussed above, because of her mental condition and the serious symptoms it had recently caused, she was not permitted by law to work at Third Way at the time of her discharge, and she was therefore not "qualified" within the meaning of the ADA.

As for a reasonable accommodation, there is no evidence that she requested one. She merely requested reinstatement. Looking back, she now argues that a "limited leave for medical treatment may qualify as reasonable accommodation." *See Rascon v. U.S. West Commc'ns, Inc.*, 143 F.3d 1234, 1333–34 (10th Cir. 1998).

---

[10] In a throwaway line inconsistent with its briefing on the FMLA, Third Way argues that "[Ms.] Melville has not provided any evidence that she was disabled pursuant to the ADA." (Doc. 67, at 23.) "Disability" under the ADA includes "an individual . . . [with a] mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102. Even if, by some stretch of the imagination, Ms. Melville is not provably disabled under the ADA, she has surely shown enough to meet her burden at the summary judgment stage. Moreover, Third Way does not dispute that "Plaintiff suffered from a serious health condition." (Doc. 79 ¶ 26.)

14

That may be so, but the question is not what we now know, or what the opinion of an expert who examined the plaintiff in 2019 is, but what was known and requested at the time of the adverse action. And when a plaintiff "has failed to present any evidence of the expected duration of her impairment *as of the date of her termination*," she cannot show she requested a reasonable accommodation. *Hudson*, 87 F.3d at 1169 (emphasis added; finding unpaid leave of indefinite duration unreasonable as an accommodation under the ADA). There are no facts to show that Ms. Melville was qualified, either with or without a reasonable accommodation at the time of her termination. Her allegations that she would have been able to perform the essential functions of her job had she asked for a reasonable accommodation do not controvert that she never did, in fact, request one. She has also failed to show how she could be qualified to work as a therapist given her existing medical condition and failure to disclose those conditions to the Board. Because there is a lack of evidence for essential elements of her ADA claims, summary judgment in favor of Third Way on Counts II and III is also appropriate.

### C. Invasion of Privacy Claim Against Ms. Maple (Count IV)

Colorado recognizes "a tort claim for invasion of privacy in the nature of unreasonable publicity given to one's private life." *Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377 (Colo. 1997). To prevail on such a claim, a plaintiff must show: (1) the fact or facts disclosed must be private in nature; (2) the disclosure must be made to the public; (3) the disclosure must be one which would be highly offensive to a reasonable person; (4) the fact or facts disclosed cannot be of legitimate concern

to the public; and (5) the defendant acted with reckless disregard of the private nature of the fact or facts disclosed. *Id.*

In the Complaint, Ms. Melville alleged only that "Defendant Maple publicly disclosed private facts about Plaintiff, namely her mental health conditions." In response to the instant motion, Ms. Melville cites to three portions of the record she believes factually support this claim. These recount that on August 24, 2017, *after* Ms. Melville went to the hospital, Ms. Maple called Ms. Johnson and they decided to tell the team about it; sometime after that, Ms. Maple consulted a Dr. Messenbaugh seeking advice about what to communicate to the team about the incident; and on or around September 14, 2017, Ms. Maple told coworkers that Ms. Melville was not returning because of medical reasons. (Doc. 80-1, at 18–20; Doc. 80-10, at 3.) Each of these events, however, followed Ms. Melville personally telling coworkers about her mental condition, suicide attempts, and suicidal ideations. (Doc. 87, at 5–6.)

Ms. Melville's unsupported conclusion that she has made out a prima facie case on this claim is not sufficient to survive summary judgment. She has not matched a single fact to any of the required elements, and the circumstances to which she cites affirmatively disprove her claim: Ms. Maple cannot be liable for disclosing facts that Ms. Melville had already publicly disclosed herself. There is no genuine issue for trial on this tort, and summary judgment should enter in favor of Ms. Maple on Count IV.[11]

---

[11] Briefly, the Court addresses Ms. Melville's counsel's ire over Defendants' counsel's disclosure of an e-mail in which the former stated: "In light of Ms. Melville's responses to discovery and her deposition testimony yesterday, we wish to withdraw/dismiss her claim of Invasion of Privacy against Ms. Maple." (Doc. 67-1,

16

**D. Outrageous Conduct Claim Against Ms. Johnson (Count V)**

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. The elements are that: (1) the defendant engaged in extreme and outrageous conduct (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) the plaintiff incurred severe emotional distress. *Rugg v. McCarty*, 476 P.2d 753 (Colo. 1970). "Outrageous conduct" is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994). Even so, "[t]he outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982).

Ms. Melville based this claim on her assertion that, despite her being "eminently qualified to work as a therapist," her "then-existing mental ailments

---

at 26.) She did not subsequently withdraw the claim as indicated. Now, counsel is incensed by what he calls "improperly and unethically divulged negotiations and efforts to reach a compromise which were protected by FRE 408." Counsel, however, incorrectly assumes that communications made in so-called settlement discussions are strictly confidential for all purposes. The rule merely prohibits using conduct or statements made during compromise negotiations as *evidence* "either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408. They are not *per se* "protected" in any blanket manner. In fact, the rule does not require exclusion when the evidence is brought for another purpose, such as to show an attorney knowingly maintained an objectively frivolous claim through summary judgment. *See* Fed. R. Civ. P. 11. The Court has not relied on the email here.

made her particularly susceptible to stress," and Ms. Johnson's terminating her and telling her to seek less-stressful work as a waitress, given these circumstances, was outrageous. But, as the record reflects, Ms. Johnson demonstrated sympathy for Ms. Melville, and it does not go beyond the bounds of decency or offend community notions of acceptable conduct to tell an employee who is disqualified (even if temporarily) from working at a company that she is "terminated," or to offer that employee ideas as to how to improve her financial situation. *See, e.g.*, *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 384 (10th Cir. 1988) ("It is well-settled under Colorado law that discharge from employment, without more, is not outrageous conduct."); *Shackelford v. Courtesy Ford, Inc.*, 96 F. Supp. 2d 1140, 1147 (D. Colo. 2000) ("Termination from employment does not rise to the level of intentional infliction of emotional distress."). No reasonable factfinder could conclude otherwise.

Finally, missing from Ms. Melville's case are any facts supporting the third element—that she did, in fact, experience severe emotional distress. In her deposition, Ms. Melville stated that, from these events, she "walked away feeling like [Ms. Johnson] was trying to tell me she was firing me for my own good, which at the time was frustrating." Though Colorado law considers a defendant's knowledge of a plaintiff's unique mental condition relevant in considering outrageousness, that does not supplant the requirement that a plaintiff suffer

actual severe emotional distress, to which Ms. Melville's mere frustration does not amount.[12] The Court grants summary judgment in favor of Ms. Johnson.[13]

## III. CONCLUSION

For the foregoing reasons, the various motions to file restricted documents (Docs. 68, 77, 80, 85.) are **GRANTED**. Defendants' motion for summary judgment (Doc. 67) is **GRANTED**. The Clerk shall enter judgment as set forth herein in favor of Defendants and close this case.

Dated: July 25, 2019.

BY THE COURT:

*/s/ Daniel D. Domenico*
Daniel D. Domenico
United States District Judge

---

[12] Ms. Melville's counsel also represented that she might withdraw this claim, see *supra*, note 8, but she did not. (Doc. 67-1, at 26.)

[13] The Court grants summary judgment on behalf of the individual Defendants in Counts IV and V. Count VI seeks to hold Third Way vicariously liable for the acts of those individuals. The Court therefore grants summary judgment in Third Way's favor on Count VI because it cannot be vicariously liable when no underlying tort has been committed.

19